## THE POINT CHICO.
### No. 409.

District Court, S. D. Texas, Houston Division.

Feb. 21, 1940.

Fulbright, Crooker & Freeman and Carl G. Stearns, all of Houston, Tex., and Hill, Rivkins & Middleton, of New York City, for libellants.

Terriberry, Young, Rault & Carroll, of New Orleans, La., and Royston & Rayzor, of Houston, Tex., for respondents.

KENNERLY, District Judge.

On a voyage from the Pacific Coast to the Gulf Coast, the Steamship "Point Chico" on September 8 and 9, 1936, encountered at sea a very severe storm. Water entered the holds of the vessel, damaging cargo. This is a suit by Spreckels Sugar Company for damages to 8,000 packages of granulated sugar shipped from San Francisco, California, to Corpus Christi, Texas; by McGovern & McGovern for damages to 1,027 cartons of salmon shipped from Seattle, Washington, to New Orleans, Louisiana; and by T. E. Harris & Company and John T. Reeks for damages to 940 cartons of salmon shipped from Seattle, Washington, to New Orleans, Louisiana (all claimed to be a part of such ship's cargo), against the Steamship "Point Chico" in rem, and against its owners, Swayne & Hoyt, Ltd., in personam. Such shippers are for convenience called libellants. Libellants content themselves with alleging delivery at the points named of such merchandise to the steamship in good order, and the failure of the steamship to deliver same in good order and undamaged at point of destination.

Swayne & Hoyt, Ltd., claimants of the steamship (for brevity called respondents), in their answer, put libellants on proof. They also set forth that on the afternoon and evening of September 8, and morning of September 9, 1936, the steamship, with the merchandise of libellants on board, encountered a severe storm and heavy weather, with the wind reaching gale force, causing serious injury to the steamship. In explanation of how the water reached the holds of the vessel, respondents in their answer say that a seaman at or about 3:30 P. M., September 8, 1936, took soundings through the sounding pipe of No. 1 hold and bilge, and failed and neglected to replace the cap on such sounding pipe. That because of the heavy storm, such seaman's failure to replace the cap was not discovered until about 8 A. M. on September 9, 1936, and that in the meantime, water entered the holds of the steamship through the sounding pipe, damaging libellants' merchandise. They claim that the seaman's neglect to replace the cap on the sounding pipe was the sole cause of the cargo's damage, and that respondents are not liable under the Harter Act, Sections 190 to 195, Title 46 U.S.Code Annotated, and under the bills of lading covering libellants' merchandise.

There are no pleadings by libellants, combatting such claim by respondents, but at the trial, libellants made a statement of a number of claims with respect to the manner in which the water reached the hold of the steamship and damaged the cargo, and as to the unseaworthiness of the steamship, of some of which claims, respondents say they had no prior notice. The findings of fact include findings on these claims.

The facts are substantially as follows:

(a) Many of the facts were stipulated. It seems appropriate to quote paragraphs 1 to 8, inclusive, and paragraph 10 of the stipulation, dated September 28, 1938:

"1. If duly qualified representatives of all of the above named libellants and of the claimant-respondent were called as wit-

nesses, they would testify that the said libellants and claimant-respondent on whose behalf they were respectively called had and have the legal status, offices and places of business and were and now are engaged in the businesses alleged in the first amended libel heretofore filed herein.

"2. If duly qualified representatives of the claimant-respondent were called as witnesses, they would testify that said claimant-respondent owned, operated, managed and otherwise controlled the Steamship Point Chico at all times material herein and said steamship was and now is a general ship engaged in the common carriage of merchandise by water for hire, as alleged in the first amended libel heretofore filed herein.

"3. If duly qualified representatives of all of the above named libellants were called as witnesses, they would testify that the said libellants on whose behalf they were respectively called were the owners of the respective shipments as such ownership is alleged in the first amended libel heretofore filed herein.

"4. Each of the shipments of merchandise of the above named libellants described in the first amended libel heretofore filed herein was on board the Steamship Point Chico, in apparent good order and condition and at that time in nowise wet or damaged by salt water, when said steamship sailed from her last port of loading on the voyage mentioned in the first amended libel heretofore filed herein; and the photostats hereto annexed, marked Exhibits 1, 2 and 3 are true and complete copies of the faces of the bills of lading issued by or on behalf of said claimant-respondent and the said Steamship Point Chico at the time the said several shipments of merchandise described in the first amended libel heretofore filed herein were received for transportation as indicated therein. The backs of all the said bills of lading were identical, and the photostat annexed to this stipulation, marked Exhibit 4, is a true and complete copy of each of them.

"5. Each of the following shipments of merchandise of the above named libellants:

"8,000 packages of granulated sugar shipped by the libellant Spreckels Sugar Company and referred to in the Fifth article of the first amended libel herein;

"1027 cartons of salmon, shipped by the libellant McGovern & McGovern and re-

ferred to in the Fourteenth article of the first amended libel herein;

"940 cartons of salmon, shipped by the libellant P. E. Harris & Co., consigned to the order of the libellant P. E. Harris & Co., notify the libellant John T. Reeks, and referred to in the Twenty Second article of the first amended libel herein;

sustained some loss or damage by salt water while in claimant-respondent's possession on board said Steamship Point Chico on the voyage referred to in the first amended libel herein.

"6. Each of the shipments referred to in the preceding paragraph of this stipulation was stowed and carried in No. 1 hold of the S/S Point Chico and the loss and damage to said shipment by salt water occurred while it was in said hold of the Point Chico.

"7. The above mentioned shipment of 8,000 bags of granulated sugar of the libellant Spreckels Sugar Company was not discharged at the destination named in the bill of lading covering the same, which is attached hereto marked Exhibit 1, but was carried back to the West Coast of the United States for the purpose of being reconditioned—this was done by the mutual consent of the libellant Spreckels Sugar Company and claimant-respondent after said damage by salt water had been sustained on board said steamship.

"8. Written claim, as provided for in Paragraph Sixteen of the bill of lading covering each of the above named shipments, was duly made and filed with the claimant-respondent with respect to each of the above named shipments of merchandise of the above named libellants in the manner provided for and within the time limited in Paragraph Sixteen of the bill of lading covering each of said shipments.

"10. 'Gulf Pacific Line' is merely a trade name for Swayne & Hoyt, Ltd., and, accordingly, the libel will be dismissed as to it."

(b) It seems unnecessary to quote the face of the three bills of lading, copies of which are attached to the stipulation. On the back of each bill of lading are the words: "It is mutually agreed that the goods are to be carried under the following exceptions and conditions."

All such exceptions and conditions are referred to, but it seems necessary to

quote only Paragraphs 1, 3, 5-A, 15, 16, 18, and 23 thereof:

"1. Received in apparent good order and condition for shipment by one of the steamers owned or operated by Swayne & Hoyt, Ltd., hereafter called the 'shipowner', various packages said to contain merchandise (value, weight, quantity, quality, contents or condition of contents unknown to the shipowner), to be transported (and without prejudice to or derogation of the liberties, provisions and conditions hereinelsewhere set forth, with the right and liberty of the vessel to proceed, at the shipowner's always existing option, whether westbound or eastbound via any port or ports of the United States and/or Canada, on the Pacific Coast, any port or ports of the United States and/or Mexico, on the Gulf of Mexico, any port or ports on the Carribbean Sea, and/or any port or ports of the West Indies, in any order) to the port of destination or so near thereunto as the steamer may safely get, always afloat at all stages of the tide, on payment of the freight and charges thereon in cash without deduction. The name of the shipper, of the consignee, and of the steamer, the shipper's description of the goods, the freight payable thereon, and the port of destination, are stated on the other side of this bill of lading which forms a part hereof."

"3. The shipowner shall not be liable in any capacity for any loss, damage or delay, whether occurring during, before or after loading, transit, transhipment, discharge, delivery or other disposition of the goods due to or arising from any of the following causes: Act of God; perils or accidents of the sea or other waters or of navigation; causes beyond the carrier's control, whether specifically mentioned herein or not; collisions, strandings, jettison or wreck; fire from any cause or wheresoever occurring, on board, in craft or on shore; water, steam or chemicals used for the purpose of extinguishing fire; fault or barratry of the Master or crew or other servants of the shipowner; enemies, pirates, robbers; theft by any person, whether in the employ of the shipowner or not; arrest, restraint or act of princes, rulers, government or people; legal process or stoppage in transit; epidemics, pestilences, wars, rebellions, hostilities; riots, lockouts, stoppage of labor, strikes or labor troubles from whatsoever cause, whether partial or general, or of the shipowner's employees or others; water brine, heat, whether internal or external; frost, ice, decay, change of climate, evaporation; earthquake, floods, freshets, smell, taint, contamination, discoloration; leakage from other goods or damage from stowage or contact therewith; ferment, mold, putrification, rust, sweat, fumigation, snow, rain or spray, nature or vice or change of character of the goods, drainage, leakage, shrinkage, breakage, cracks, bending, pressure; rats or vermin, explosions; bursting of boilers; steam, breakage, accidents or derangement of shafting or machinery; latent defect in any part of the hull, boilers, engines, machinery or appurtenances of the vessel or unseaworthiness thereof or of the vessel even though existing at the time of shipment, or at the beginning of the voyage; explosions of any goods, whether shipped with or without disclosure of their nature; insufficiency or absence of packing; breakage of or damage to cast iron articles; splits, shakes, chafing or breakage of lumber or logs; inaccuracies or obliterations, errors or insufficiency or absence of marks, numbers, addresses or description; land damage; use of hooks; transhipment to or from and risk of craft and storage thereon; prolongation of the voyage, giving away, falling or destruction of wharf, shed or warehouse. Vessel is not warranted seaworthy. Except in cases where such exemption from responsibility is precluded by law, neither carrier nor the vessel shall become or be held responsible for any loss or damage or accident or danger or disaster or consequence of any thereof or for any consequence that shall result either before or after the commencement of the voyage from unseaworthiness of the vessel, though existing at the time of shipment or at the beginning of the voyage, or that shall result in whole or in part from fault or error in navigation or the management of the vessel, whether before or after the commencement of the voyage."

"5-A. The shipowner is granted the liberty to carry on or under deck at shipowner's option such goods whose nature or bulk makes it reasonable and goods carried on deck shall be transported at the risk of the owner thereof."

"15. The shipowner shall never be liable for any loss of, or damage to, said merchandise nor for any damage or loss suffered in connection therewith, unless its neglect or wilful default is shown to have been the

sole cause of the same. If the shipowner becomes liable for any damage or loss to said merchandise, it shall have the benefit of all insurance on said merchandise, and of any payments made by or on behalf of the insurer thereof, whether under the guise of advances, loans or otherwise; and shall also have the benefit of all loans, the amount of which have been determined by the total amount or part of any loss or damage to said merchandise, made the owner by the insurer thereof, and induced by the existence of insurance upon said merchandise, and which are made repayable only in the event recovery of said loss or damage is had from the shipowner or said vessel. The right to any such insurance, advances or loans may be offset in the amount thereof by the shipowner against a claim or suit for and loss or damage.

"16. Note Particularly. The carrier shall not be liable for any claim whatsoever unless suit be filed thereon within six months as hereinafter provided and unless written claim be served on the carrier at the port destined for the discharge of claimant's goods within fifteen days after the removal of the goods from the wharf or vessel, even though such removal be by customs or other authorities, or if lost or not removed from the wharf, within fifteen days after departure of vessel from port destined for discharge of claimant's goods, or if vessel and goods lost, within fifteen days after the vessel would have arrived at the port of discharge in the ordinary course of the voyage. No suit against carrier or vessel for loss or damage shall in any event be maintained and shall be barred unless filed within six months after shipment of goods herein, notwithstanding the shipowner may be a non-resident or foreign corporation. Nothing shall be deemed a waiver of the provisions of this clause except a written express waiver signed by the carrier."

"18. The shipment under the bill of lading is subject to all the provisions of Sections 4281 to 4287, inclusive of the Revised Statutes of the United States [46 U.S.C.A. §§ 181–187] and of the Act of Congress of the United States, approved February 13, 1893 [46 U.S.C.A. §§ 190–195], and entitled, 'An Act Relating to the Navigation of Vessels', etc., and to all acts amendatory and supplementary thereto. In the event of shipment being made to and or from a Canadian port the shipment is subject to all terms and conditions and all exemptions from liability contained in the 'Canadian Water Carriage of Goods Act' and the amendments thereto."

"23. In accepting this bill of lading the shipper, owner, and consignee of the goods, and holder of the bill of lading, agree to be bound by all its stipulations, exceptions and conditions, whether written, stamped or printed, as fully as if they were all signed by the shipper, owner, consignee or holder, any local custom or privileges to the contrary notwithstanding. If required by the shipowner, one signed bill of lading, duly endorsed, must be surrendered on delivery of the goods."

(c) Respondents, as owners of the Steamship "Point Chico", exercised due diligence to make said steamship in all respects seaworthy, and same was in all respects, and every respect, seaworthy, properly manned, equipped and supplied for the voyage, not only at the beginning of the voyage, but at the last port of loading. Also the officers and crew of the steamship were duly authorized to navigate a vessel of the type of the "Point Chico".

(d) While on such voyage, and on September 8 and 9, 1936, such steamship encountered a severe storm. I am impressed that the typewritten sheet in the log, dated September 8, 1936, gives a fair statement of some of the events of the storm, except that I, do not think that it is meant to say in the log that the water entered the No. 1 hold and bilge either through the sounding pipe, leaky rivets in the hold, or from water leaking through the chain pipe and down the chain locker. I think what is said with respect to the entry of the water was from the best information available at the time, and that the depositions of the master, chief officer, chief engineer, et al., should be considered in connection with the log.

I quote from the log:
"SS Point Chico Voyage 44 Sept. 8th., 1936
"Part of Sea Log—On Passage from San Pedro to Panama Canal.

"At noon of this day, encountered heavy S.E. squalls while crossing the Gulf of Lower California; About Lat. 21:23 N and Long. 108:37 W. and during the afternoon watch, the wind and sea increased denoting a 'disturbance' or 'depression'. All Loose gear about decks stowed away and lashed securely, and all turnbuckles

tightened on chain deck cargo lashings and the vessel prepared for heavy weather.

"At 5:40 P. M. Reduced speed ten revolutions, and at 6:10 P. M. speed further reduced 3 revolutions, barometer reading 29:62 and falling.

"At 6:30 P. M. Wind reached gale force from Easterly direction shifting at intervals to S.E. and back again to East, heavy seas commence breaking over fo'cle head and filling deck space between deck load up to top of #1 and 2 hatch coaming and flooding store rooms forward, as these doors are not watertight we are unable to prevent water flowing into them. Though no damage is being done to any of our stores which are stowed on shelves, clear of deck. We are unable to sound bilges of #1 hold, due to the deck being submerged with sea water and Master notified the engine department to keep pumping on this particular bilge at frequent intervals.

"At 8:30 P. M. Speed again further reduced, the sea and swell becoming larger and breaking over the forward deck load of the shingles. Vessel then 'hove to'.

"At 9:15 P. M. Wind suddenly shifted in heavy rain squall and vessel shipped a large sea which did considerable damage. It 'stove in' the starboard wing of the lower bridge, flooded the Master's quarters and saloon, 'stove in' the doors of starboard amidship alleyway and engineer's storeroom, flooded the Chief Engineer's quarters and steward's storeroom.

"On the forward deck this large sea carried away the two 'Toms' used in bracing the deck load athwartship of #1 hatch, this loosened the bundles of shingles stowed on that part of the vessel and an unknown number of bundles were washed overboard. Some bundles were swept down against the foremast and smashed against the deck cargo winches at #1 and #2 hatches. The cargo ventilators which were stowed and lashed to boom rest on the after part of the fo'cle head, are battered and 'stove in'. (Note: When deck cargo of lumber is carried, the ventilators are unshipped and stowed and lashed in the most suitable place until deck load has been discharged, then replaced in their proper place). Also the guard railing on the after end of the fo'cle head is bent and broken, and the cargo which levers on the #1 winches are gone.

"All deck officers and a sufficient number of men immediately turn to and secure all loose gear and cargo as far as the safety of the crew will permit, but due to the wind force and heavy sea were unable to take care of the cargo toms and loose shingles at this time. It being too dangerous to proceed to the fore end of the deckload. The Master again notified the engine department to pump out the bilges in forward end of vessel by sending the 3d Officer at this time, down to the Chief Engineer. The Chief reported in person to the bridge and informed the Master that he has left orders to his engineers to pump the bilges every hour. The Master remains on the bridge throughout the night and sent the officer of the watch, every half hour to inspect the hatch tarpaulings at the different hatches for leaks, or any damage being done to gear about decks, all hatch tarpaulings found in good condition.

"A. M. Sept. 9th. * * * From midnight on to daybreak the sea and wind slowly moderates, and at 8:00 A. M. we are able to replace the 'Toms' and secure all loose bundles of shingles on the forward deck load, and gather up and place in storerooms forward, the loose shingles that had been swept about the decks by the sea.

"At 8:30 A. M. * * * The Chief Officer and 1st Asst. Engineer proceed to sound the number one bilges and upon removing the loose shingles from atop the starboard sounding pipe, it was found that the sounding pipe 'plug' or 'cap' was not in place and this would allow considerable sea water to drain down thru the pipe into the bilge. Soundings were taken and a depth of fifty inches was found in both port and starboard bilge. We are not at this time certain as to how this amount of water accumulated in the bilges, as it may be coming from leaky rivets in the hull, or from water leaking thru the broken cement in chain pipe (which cracked up by the sea pounding against the chain during the heavy blow), on down into the chain locker, which drains into the number one bilge. The Master and Chief Engineer informed of this finding immediately and the bilge pump is kept working to discharge this water. Soundings being taken every half hour to check up on the progress of discharge.

"At 10:45 A. M. Vessel brought back on course, and at 11:05 A. M. slowly increased

speed. At 11:30 A. M. Engines again at full speed.

> "[sgd]    Tex Gordon
> "Chief Officer.

"[sgd]    Walter Hansen
"Master.

"[sgd]    B. C. O'Neal
"Chief Engineer."

(e) It is claimed by libellants that the sounding pipe cap was defective, and that it worked itself out, or that it was worked out, by the action of the wind, water and debris. The cap is in evidence. I do not think it is defective. I think it would be unreasonable to conclude and find that even if only partially screwed in, the cap was worked out by the action of the wind, waves, or debris. The only reasonable conclusion and finding is that, as claimed by respondents, it was left out by a seaman after he had taken soundings through the sounding pipe. I so find.

(f) A careful study of the evidence convinces me that the water in the hold and bilges which damaged the cargo entered through the sounding pipe, the cap being left off of it by a seaman, and I so find. I find that it did not enter through the anchor chain pipe, through the rivets, nor otherwise, than through the sounding pipe. This seems to me the only reasonable conclusion.

(g) It is claimed by libellants that the condition of the collar or entrance to the anchor chain pipe rendered the ship unseaworthy. I find it did not. In fact, I think and find that such condition was not at all serious or unsafe.

(h) It is contended that the shingles and other cargo on the upper deck were improperly stowed and caused more water to enter the sounding pipe when the cap was left off, or to enter the anchor chain pipe, if water entered in that way, than would have entered had the deck cargo been differently stowed. I think the evidence shows that the deck cargo was properly stowed, and I so find, and find that the manner in which it was stowed did not in any way contribute to the water entering the hold.

(i) It is claimed that prior to the ship's sailing from San Francisco, scraps of paper were left by the stevedores or others in the bilges, clogging them and preventing the ship from emptying its bilges by pumping. I think the evidence shows this claim to be unfounded and without merit. I think the evidence shows that the paper in the bilges was the same paper that was around the sugar, and that it entered the bilges from the hold during the storm. I so find.

(j) I find against libellants and for respondents on their various claims made at the trial as to the manner in which water entered the hold of the steamship, and on their various claims made at the trial that the ship was not seaworthy at the beginning of the voyage and at the last port of loading.

(k) Not only did libellants at the trial make claims respecting the unseaworthiness of the steamship, but two expert witnesses who testified for libellants found much to be criticized about the steamship. I have considered their testimony, and find against their claim that the steamship was unseaworthy, either at the beginning of the voyage, or at the last port of loading.

1. Proctors for both libellants and respondents have cited a great number of cases. The rule applicable to the facts found here is stated clearly in most of them. To discuss them all would unduly prolong these conclusions. Nowhere is the rule more clearly stated than in The Wildcroft, 201 U.S. 378, 385, 26 S.Ct. 467, 50 L.Ed. 794, 795. The facts here showing not only that the owners used due diligence to make the "Point Chico" in all respects seaworthy at the beginning of the voyage and at the last port of loading, but that she was in fact in all respects seaworthy, properly manned, equipped and supplied at the beginning of the voyage and at the last port of loading, and that the damage to libellants' merchandise resulted "from faults or errors in navigation or in the management of said vessel" within the meaning of the Harter Act, I conclude that libellants may not recover.

Judgment for respondents.